Priority ✓
Send ——
Enter ——
Closed ——
JS-5/JS-6 ——
JS-2/JS-3 ——
Scan Only ——

CLERK, U S DISTRICT COURT

MAY 19 2005

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

BINH THAI VO,

        Petitioner,

        VS.

EDWARD S. ALAMEIDA, Director,

        Respondent.

CASE NUMBER SACV 02-00741-PA (MAN)

NOTICE OF FILING OF MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

TO:    ALL PARTIES OF RECORD

Allen R. Bloom
Attorney At Law
1202 Kettner Blvd., #4300
San Diego, CA 92101-3234

Elizabeth S. Voorhies
Deputy Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

    You are hereby notified that pursuant to the Local Rules Governing Duties of Magistrate Judges, the Magistrate Judge's report and recommendation has been filed on <u>May 19, 2005,</u> a copy of which is attached.

    Any party having objections to the report and recommendation shall, not later than <u>**June 3, 2005**</u>, file and serve a written statement of objections with points and authorities in support thereof before the Honorable MARGARET A. NAGLE, U.S. Magistrate Judge.

    Failure to so object within the time limit specified shall be deemed a consent to any proposed findings of fact. Upon receipt of objections, or upon lapse of the time for filing objections, the case will be submitted to the District Judge for disposition. Following entry of judgment and/or order, all motions or other matters in the case will be considered and determined by the District Judge.

    The report and recommendation of Magistrate Judge is not a final appealable order. A notice of appeal pursuant to Federal Rules of Appellate Procedure 4(a)(1) should not be filed until entry of a judgment and/or order by the District Judge.

                    CLERK, UNITED STATES DISTRICT COURT

<u>Dated: May 19, 2005</u>
Attachment

By  <u>Earlene Carson</u>
Deputy clerk



DOCKETED ON CM

MAY 19 2005

BY _____ 059



M-51A(11/01)    NOTICE OF FILING OF MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

FILED
CLERK, U S DISTRICT COURT

MAY 19 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

BINH THAI VO,                          )  NO. SACV 02-741-PA (MAN)
                                       )
                 Petitioner,           )  REPORT AND RECOMMENDATION OF
                                       )
         v.                            )  UNITED STATES MAGISTRATE JUDGE
                                       )
EDWARD S. ALAMEIDA, Director,          )
                                       )
                 Respondent.           )
_____)

This Report and Recommendation is submitted to the Honorable Percy Anderson, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order No. 01-13 of the United States District Court for the Central District of California.

### INTRODUCTION

Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, on July 30, 2002 ("Petition"). Respondent subsequently filed an Answer and Petitioner then filed a Traverse.

The matter, thus, is submitted and ready for decision.

## PRIOR PROCEEDINGS

On September 30, 1998, an Orange County Superior Court jury found Petitioner guilty of: (1) one count of kidnapping during the commission of carjacking, in violation of California Penal Code § 209.5(a) (Count One, victim Pauline Tran); (2) one count of kidnapping for the purpose of robbery, in violation of California Penal Code § 209(b) (Count Two, victim Pauline Tran); (3) one count of carjacking, in violation of California Penal Code § 215(a) (Count Three, victim Pauline Tran); (4) five counts of second degree robbery, in violation of California Penal Code §§ 211, 212.5(c), and 213(a)(2) (Count Four, victim Pauline Tran, and Counts Five through Eight, victims Annie Fung, Sui Wa Ng, Kwan Eng, and Elsie Smith). (Clerk's Transcript ("CT") 348-55.)  The jury found true allegations that Petitioner personally used a firearm, in violation of California Penal Code § 12022.4, during the commission of the offenses charged in Counts One through Four. (CT 356-59.)  The jury did not find true allegations that Petitioner was armed with a firearm, in violation of California Penal Code § 12022(a)(1), during the commission of the offenses charged in Counts Five through Eight.  (CT 360-63.)[1]

On December 21, 1998, the trial court sentenced Petitioner to an indeterminate term of life with the possibility of parole on Count One and a consecutive aggregate term of 14 years on Counts Five through Eight and the enhancements on Counts One and Five through Eight.  The trial court stayed the sentences on Counts Two and Four, pursuant to

---

[1]     The jury found Petitioner's co-defendant, Quan Duy Pham, guilty of the same offenses and enhancements.  (CT 332-47.)

2

California Penal Code § 654, and dismissed Count Three as a lesser necessarily included offense of Count One.  (CT 482-84, 492-94.)

Petitioner appealed his conviction to the California Court of Appeal.  On February 9, 2001, the California Court of Appeal issued an unpublished opinion affirming Petitioner's conviction and sentence. (Notice of Lodgment of December 23, 2002 ("Lodgment") No. 3.) Petitioner filed a petition for review in the California Supreme Court. (Lodgment No. 4.)  On May 2, 2001, the California Supreme Court denied the petition without comment or citation to authority.  (Lodgment No. 5.)

### SUMMARY OF EVIDENCE AT TRIAL

### I.   PROSECUTION EVIDENCE

#### A.   Counts One Through Four - Victim Tran

On February 28, 1996, at approximately 7:15 p.m., Pauline Tran walked out of a shopping mall in Westminster, California, and got into her Honda Accord.  (2 Reporter's Transcript ("RT") 163-65.)  Two young men approached the car and, speaking in Vietnamese, one said: "Open the door.  I have a gun."  (2 RT 166, 168.)  Both men were around 21 years old, around 5'2" or 5'5" tall, and of Vietnamese origin.  Each carried a black automatic handgun.  (2 RT 167-70.)  Tran identified Petitioner and Pham in court as the two men.  (2 RT 196.)  Petitioner was wearing a brown jacket.  (1 RT 128.)

3

1    Pham opened Tran's front passenger door while Petitioner opened the
2    passenger side rear door, and both jumped in the car.  (2 RT 168, 205.)
3    They both pointed their guns at Tran's head and told her to drive  (2
4    RT 201-02.)  Because Tran was too terrified to drive, they told her to
5    slide over to the passenger seat.  (2 RT 202-03.)  Tran said she could
6    not switch seats without getting out of the car.  She and Pham got out
7    of the car and switched seats.  (2 RT 170-71, 203.)  While she was out
8    of the car, Tran noticed an old white Toyota nearby.  (2 RT 183-84, 186-
9    87.)

10

11    Pham drove the car out of the parking lot and onto the freeway.
12   (RT 171.)  Pham demanded Tran's money.  (2 RT 173.)  Tran said she did
13   not have any.  (2 RT 173.)  Pham told her to stop at the ATM at her
14   bank.  (2 RT 183.)  Tran said that she did not have a pin number.  (2
15   RT 173, 175.)  Pham was driving with one hand and pointing his gun at
16   Tran with the other.  (2 RT 173.)  Petitioner, who was in the back seat,
17   held his gun to the back of Tran's neck.  (2 RT 173, 175.)  Petitioner
18   opened Tran's purse and took the $3.00 that was in there.  (2 RT 174.)
19   Pham ordered Tran to remove her jewelry.  When she did not comply, he
20   ripped her necklace from her neck.  (2 RT 177.)  He wanted Tran to give
21   him $500.  When she said she did not have that much money with her, he
22   wanted her to buy something for him on her credit card.  (2 RT 175.)
23   Both Pham and Petitioner threatened to kill Tran and throw her onto the
24   freeway if she did not give them money.  (2 RT 178-79.)

25

26    Pham stopped on the street near a 7-11 market and told Tran to go
27   and buy 50 cartons of Marlboro cigarettes, which he was planning to sell
28   for $500.  (2 RT 180-81.)  Tran told him that the 7-11 was too small to

4

1   have 50 cartons of cigarettes in the store. (2 RT 181-82.) She wanted

2   Pham to drive to a big supermarket where she could get help. (2 RT

3   182.) A Vietnamese man got out of a car, approached Tran's car and

4   told Pham not to stop there. (2 RT 183-84.) The man then returned to

5   his car. (2 RT 184-85.)

6

7        Pham drove to a Von's Market in Long Beach. (2 RT 185.) Pham told

8   Tran to go inside and buy 50 cartons of cigarettes. (2 RT 185.) He

9   said that two men would pick her up in a white car when she came out

10  with the cigarettes. (2 RT 185-86.) He said that if she did not

11  return, he would try to kill her and would destroy her car. (2 RT 187.)

12

13       Tran went into the store and told the manager, Steven Saran, that

14  she had been carjacked and that two Asian men in a white car parked

15  outside were waiting for her to come out. (1 RT 94-95; 2 RT 186, 189.)

16  Serna called the police and went to the parking lot on the pretext of

17  bringing in shopping carts. (1 RT 96.) He saw a white car with three

18  people in it. A fourth person, an Asian man, was leaning partially out

19  of the driver's side gazing at the store entrance as if anxiously

20  waiting for someone. (1 RT 97-99.) Serna memorized the license plate

21  number, went inside, and wrote it down. (1 RT 99-100.) While he was

22  still outside, the car began to pull out of the parking lot. (1 RT 99.)

23

24       Long Beach Police Officer Michael Minton was dispatched to the

25  store at 7:16 p.m. (1 RT 123.) He interviewed Tran, who was screaming

26  and clinging to him, and obtained the paper with the license plate

27  number from Serna. (1 RT 123-24.)

28

5

B.   **Counts Five Through Eight - Victims Fung, Ng, Liu, and Smith**

That same evening, at about 9:15 p.m., Kwan Eng Liu[2] was driving her Mercedes in an area about five miles away from the Von's store. (1 RT 129-30, 133; 2 RT 335-37, 350.)   With her in the car were three friends:  Silvia (or Sui Wah) Ng, Annie Fung, and Elsie Smith.  (2 RT 335-36.)   Ng was visiting from Hong Kong, and Smith was visiting from New York.  (3 RT 346, 347.)   As Liu was backing out of a parking lot, a white Japanese car stopped behind her.  (2 RT 338.)   Four young Asian men got out and ordered her to open her door.  (2 RT 338.)   Two of the men had small black guns.  (2 RT 339.)   The women started screaming. (2 RT 340.)

Liu opened the door and got out.  (2 RT 341.)   The armed man at her door took her ring.  (2 RT 342.)   The other men took purses belonging to Ng, Fung, and Smith, as well as Smith's camera.  (2 RT 343-44, 355; 3 RT 471.)   The men then got in their car and drove away.  (2 RT 344-45.)

Liu described the suspects to the police as male Vietnamese, all between 18 and 22 years old.  (3 RT 470.)   The man who first spoke to her wore a brown jacket.  (3 RT 470.)   At trial, she testified that the young men were Asian, but she could not tell their nationality.  (3 RT 360.)   The police officer who took a statement from the four women testified that they referred to the perpetrators throughout as

---

[2]     Liu testified that her last name was "Liu," but it appears as "Eng" in the information and verdicts.

1   Vietnamese.  (3 RT 477.)  Liu was not able to identify anybody at a

2   lineup.  (3 RT 348-49.)

3

4   **C.   <u>Petitioner's Arrest</u>**

5

6      Sometime between 10.00 p.m. and 11:00 p.m. on the day of the

7   robbery, Tran's car was found parked about half a block from the Von's

8   store.  (1 RT 128-29, 148.)  Tran's purse was inside the car, but the

9   $3 cash in the purse and a gift in the trunk she had bought for her

10  sister were missing.  (1 RT 148; 2 RT 190-91.)

11

12     At about 3:00 a.m. that night, police officers contacted Hai

13  Nguyen, who was the owner of a 1988 white Toyota Corolla with a license

14  plate number corresponding to that written down by Serna, at his

15  apartment in Anaheim.  (1 RT 101; 2 RT 377, 379.)  Inside the car, the

16  police found Ng's purse, with her credit cards and identification in it.

17  (2 RT 380-81.)  The police impounded the car.  (2 RT 382.)  A second

18  search revealed make-up later identified as belonging to Liu and her

19  friends, a half-empty box of Marlboro Lights cigarettes, and a pair of

20  sunglasses on which Petitioner's fingerprints were found.  (2 RT 382-84;

21  3 RT 419, 425, 442, 575-76, 611.)  Petitioner's and Pham's fingerprints

22  were on the car.  (3 RT 574-77.)  Nguyen's fingerprints were on Tran's

23  car.  (RT 571-72, 574, 589.)

24

25     The police ran the fingerprints against the California fingerprint

26  database and eventually obtained the names of Petitioner and Pham and

27  put together a photographic lineup.  (3 RT 406-07.)  On July 25, 1996,

28  Tran viewed a photographic lineup.  (2 RT 191-92, 225-27.)  After a

7

moment, she identified Pham as the man who had driven her car.   (2 RT 192, 300-1; 3 RT 480-82, 486.)  Tran viewed a second photographic lineup on August 28, 1996.  Without hesitation, she identified Petitioner as the man who sat in the back seat and pointed a gun at her neck.  (3 RT 300-01, 482-83.)

The police obtained arrest warrants for Petitioner and Pham and, on November 7, 1996, went to Pham's last known residence in Westminster.  (3 RT 407-08.)  To the officers' surprise, Petitioner opened the door.  (3 RT 409-10.)   The police arrested him.   (3 RT 411.)   Petitioner consented to a search of his car, in which the police found a half-empty box of Marlboro Lights cigarettes.  (3 RT 412, 419-20.)

On March 5, 1997, Tran viewed a live lineup.  (3 RT 193-94, 296-97; 3 RT 509-10.)  She stated that Petitioner looked like the man in the back seat of her car.  (3 RT 298, 322-24; 3 RT 511, 543.)  At another lineup on June 26, 1997, she was unable to make an identification of Pham.   (3 RT 298-99; 3 RT 512.)

At the preliminary hearing on October 10, 1997, Tran identified Petitioner as the man in the back seat and identified Pham as the driver.  (2 RT 196-97; CT 69-70.)  Tran also identified Petitioner and Pham at trial.   (2 RT 196.)

Liu was not able to make an identification during a lineup.  (2 RT 348-49.)

## II.  **DEFENSE EVIDENCE**

Petitioner and Pham presented a defense of mistaken identity. Dr. Kathy Pedzek, a psychology professor, testified about factors which adversely affect eyewitness identification, perception, and memory.  (4 RT 693-37.)

### PETITIONER'S CONTENTIONS

1.   Petitioner's right to due process was violated, because the evidence was insufficient to support his conviction for second degree robbery of Annie Fung, Sui Wa Ng, Kwan Eng Liu, and Elsie Smith. (Petition at 4-5; Memorandum of Points and Authorities in Support of the Petition ("Pet. Memo.") at 4-9.)

2.   Petitioner's right to due process right was violated, because the trial court refused to give Petitioner's proposed modification of the standard jury instruction regarding eyewitness identification. (Petition at 5-6; Pet. Memo. at 9-11.)

3.   Petitioner's Sixth Amendment right to an impartial jury was violated by jury misconduct.  (Petition at 6-9; Pet. Memo. at 13-20.)

4.   Petitioner's right to due process was violated, because the trial court misunderstood applicable sentencing law.  (Petition at 9-10; Pet. Memo. at 20-23.)

1    5.   Petitioner's sentence constitutes cruel and unusual punishment

2  in violation of the Eighth Amendment.   (Petition at 10; Pet. Memo. at

3  23-24.)

4

5                          **STANDARD OF REVIEW**

6

7       The Petition was filed in 2002.   Thus, it is governed by the

8  provisions of the Antiterrorism and Effective Death Penalty Act of 1996

9  ("AEDPA").   *See* <u>Lindh v. Murphy</u>, 521 U.S. 320, 326, 117 S. Ct. 2059,

10  2063 (1997).   Under the AEDPA, a federal court may not grant a writ of

11  habeas corpus on behalf of a person in state custody "with respect to

12  any claim that was adjudicated on the merits in state court proceedings

13  unless the adjudication of the claim (1) resulted in a decision that was

14  contrary to, or involved an unreasonable application of, clearly

15  established Federal law, as determined by the Supreme Court of the

16  United States; or (2) resulted in a decision that was based on an

17  unreasonable determination of the facts in light of the evidence

18  presented in the state court proceeding."   28 U.S.C. § 2254(d); *see also*

19  <u>Brown v. Payton</u>, ___ U.S. ___, 125 S. Ct. 1432, 1438 (2005)..

20

21       In this case, review of Petitioner's claims is governed by Section

22  2254(d)(1).[3]   "Clearly established Federal law," for purposes of Section

23  2254(d)(1), "refers to the holdings, as opposed to the dicta, of [the

24  Supreme] Court's decisions as of the time of the relevant state-court

25  decision."   <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523

26  _____

27       [3]   Petitioner has not raised any Section 2254(d)(2) challenge to
   the state court's rejection of his claims, and the record does not
28  reveal any basis for such a challenge.

1    (2000); *see also* <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71, 123 S. Ct. 1166,

2    1172 (2003)(clearly established federal law is "the governing legal

3    principle or principles set forth by the Supreme Court at the time the

4    state court renders its decision").   However, the Section 2254(d)(1)

5    standard "does not require citation of [Supreme Court] cases -- indeed,

6    it does not even require *awareness* of [Supreme Court] cases, so long as

7    neither the reasoning nor the result of the state-court decision

8    contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 365

9    (2002)(*per curiam*)(emphasis in original).[4]

10

11    With respect to applying Section 2254(d)(1)'s two prongs, the

12    Supreme Court has explained:

13

14        Under the "contrary to" clause, a federal habeas court may

15        grant the writ if the state court arrives at a conclusion

16        opposite to that reached by this Court on a question of law

17        or if the state court decides a case differently than this

18        Court has on a set of materially indistinguishable facts.

19        Under the "unreasonable application" clause, a federal habeas

20        court may grant the writ if the state court identifies the

21        correct governing legal principle from this Court's decisions

22

23        [4]    While circuit law may be "persuasive authority" in analyzing

24    whether a state court decision was an unreasonable application of
       Supreme Court law, "only the Supreme Court's holdings are binding on the

25    state courts and only those holdings need be reasonably applied." <u>Clark</u>
       <u>v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir.), *cert. denied*, 124 S. Ct. 446

26    (2003); *see also* <u>Ortiz-Sandoval v. Clarke</u>, 323 F.3d 1165, 1172 (9th Cir.
       2003) (habeas relief not warranted when state court decision arguably

27    was an unreasonable application of Ninth Circuit precedent but not of
       Supreme Court precedent; under the AEDPA, "a state court decision may

28    not be overturned simply because of a conflict with circuit law").

1    but unreasonably applies that principle to the facts of the

2    prisoner's case.

3

4 Williams, 529 U.S. at 412-13, 120 S. Ct. at 1523; accord Payton, 125 S.

5 Ct. at 1438-39; Early, 537 U.S. at 8, 123 S. Ct. at 365; Bell, 535 U.S.

6 at 694, 122 S. Ct. at 1850; Penry v. Johnson, 532 U.S. 782, 793, 121 S.

7 Ct. 1910, 1918 (2001).

8

9    The "unreasonable application" inquiry is an objective one, and the

10 standard is not met merely by a showing of error or of an incorrect

11 application of the governing federal law.  Andrade, 538 U.S. at 75, 123

12 S. Ct. at 1174; Woodford v. Visciotti, 537 U.S. 19, 25, 123 S. Ct. 357,

13 360 (2002)(per curiam); Williams, 529 U.S. at 409, 120 S. Ct. at 1521.

14 Federal courts may not "grant relief under AEDPA by conducting [their]

15 own independent inquiry into whether the state court was correct as a

16 de novo matter." Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140,

17 2150 (2004).  "[E]ven if the federal habeas court concludes that the

18 state court decision applied clearly established federal law

19 incorrectly, relief is appropriate only if that application is also

20 objectively unreasonable."  Penry, 532 U.S. at 793, 121 S. Ct. at 1918

21 (citing Williams); accord Alvarado, supra; Price v. Vincent, 538 U.S.

22 634, 123 S. Ct. 1848, 1853 (2003); Andrade, 538 U.S. at 75, 123 S. Ct.

23 at 1174; Bell, 535 U.S. at 694, 699, 122 S. Ct. at 1850, 1852.  Further,

24 the Supreme Court has explained that the "range of reasonable judgment"

25 to be assessed under the "unreasonable application" prong of Section

26 2254(d)(1) is dependent on the nature of the clearly-established law in

27 question, to wit, whether the rule the high court has stated is general

28 or specific.  As to specific legal principles, the "range of reasonable

1  judgment" "may be narrow." As to general standards, "[t]he more general

2  the rule, the more leeway courts have in reaching outcomes in case by

3  case determinations." Alvarado, 124 S. Ct. at 2149.

4

5  Here, Petitioner raised the claims in this Petition on direct

6  appeal.  The California Court of Appeal resolved the claims on the

7  merits in a written, reasoned decision.  (Lodgment No. 3.)  The

8  California Supreme Court denied relief summarily.  (Lodgment No. 5.)

9  The high court's denial is considered to be "on the merits" and is

10  presumed to rest on the grounds articulated by the California Court of

11  Appeal. See, e.g., Ylst v. Nunnemaker, 501 U.S. 797, 803-06, 111 S. Ct.

12  2590, 2594-96 (1991); Gaston v. Palmer, 387 F.3d 1004, 1013 (9th Cir.

13  2004); Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992).  Thus,

14  this Court may "look through" the California Supreme Court's summary

15  denial and apply the deferential standard of 28 U.S.C. § 2254(d) to the

16  California Court of Appeal's opinion. See Ylst, supra;  Kennedy v.

17  Lockyer, 379 F.3d 1041, 1052 (9th Cir. 2004); Gill v. Ayers, 342 F.3d

18  911, 917 n.5 (9th Cir. 2003); Sandgathe v. Maass, 314 F.3d 371, 377 (9th

19  Cir. 2002).

20

21                              DISCUSSION

22

23  I.  PETITIONER'S SUFFICIENCY OF THE EVIDENCE CLAIM DOES NOT WARRANT

24      FEDERAL HABEAS RELIEF.

25

26  In Ground One, Petitioner contends that there was insufficient

27  evidence to convict him of Counts Five through Eight, pertaining to the

28  robbery of Liu, Ng, Fung, and Smith, because he was tied to that robbery

1  solely through circumstantial evidence of his involvement in the earlier

2  robbery of Tran.   (Petition at 4-5; Pet. Memo. at 4-9.)

3

4       The United States Supreme Court announced the federal standard for

5  determining the sufficiency of the evidence to support a conviction in

6  Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781 (1979).   California

7  courts generally follow the Jackson standard when assessing such claims.

8  See, e.g., People v. Cuevas, 12 Cal. 4th 252, 260-61, 48 Cal. Rptr. 2d

9  135, 140 (1995); People v. Johnson, 26 Cal. 3d 557, 576-77, 162 Cal.

10 Rptr. 431, 443-44 (1980).   The Jackson standard applies to federal

11 habeas claims attacking the sufficiency of the evidence, whether

12 reviewed de novo or through the "filter" of Section 2254(d).   See Chein

13 v. Shumsky, 373 F.3d 978, 983 (9th Cir.)(en banc), cert. denied, 125 S.

14 Ct. 415 (2004); see also Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir.

15 2004).[5]

16

17      When a federal habeas court reviews a sufficiency of the evidence

18 claim, its job is not to determine whether it is satisfied that the

19 evidence established guilt beyond a reasonable doubt.   See Payne v.

20 Borg, 982 F.2d 335, 338 (9th Cir. 1993).   Rather, the pertinent question

21 is whether, "after viewing the evidence in the light most favorable to

22 the prosecution, any rational trier of fact could have found the

23

24      [5]    In Chein, the Ninth Circuit concluded that there is some

25 question as to the impact of the AEDPA on the Jackson standard in habeas

    review, viz., whether federal habeas courts should apply Jackson "as

26 written" or, instead, should simply determine whether, under Section

    2254(d)(1), the state court reasonably applied the Jackson standard.

27 The Ninth Circuit, however, left this question open.   373 F.3d at 983.

    For the reasons set forth infra, Petitioner's claim fails whether viewed

28 through the prism of Section 2254(d)(1) or under Jackson "as written."

1   essential elements of the crime beyond a reasonable doubt." *Jackson*,

2   443 U.S. at 319, 99 S. Ct. at 2789 (emphasis in original). *See also*

3   Wright v. West, 505 U.S. 277, 284, 112 S. Ct. 2482, 2485-86 (1992);

4   McMillian v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). "Put another way,

5   the dispositive question under *Jackson* is 'whether the record evidence

6   could reasonably support a finding of guilt beyond a reasonable doubt.'"

7   Chein, 373 F.3d at 982-83 (quoting Jackson).

8

9       When the factual record supports conflicting inferences, the

10   federal court must presume -- even if it does not affirmatively appear

11   on the record -- that the trier of fact resolved any such conflicts in

12   favor of the prosecution, and the court must defer to that resolution.

13   *See* Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. "*Jackson* cautions

14   reviewing courts to consider the evidence 'in the light most favorable

15   to the prosecution.'"   Bruce, 376 F.3d at 957 (quoting Jackson).

16   Additionally, "'[c]ircumstantial evidence and inferences drawn from it

17   may be sufficient to sustain a conviction.'"   Walters v. Maass, 45 F.3d

18   1355, 1358 (9th Cir. 1995) (citation omitted).

19

20       This Court must refer to the substantive elements of the criminal

21   offense as defined by state law and look to state law to determine what

22   evidence is necessary to convict on the crime charged. *See* Jackson, 443

23   U.S. at 324 n.16, 99 S. Ct. at 2792 n.16. Further, the Court must defer

24   to the state court's interpretation of state law. *See* Wainwright v.

25   Goode, 464 U.S. 78, 84, 104 S. Ct. 378, 382 (1983) ("[T]he views of the

26   state's highest court with respect to state law are binding on the

27   federal courts"); *see also* Missouri v. Hunter, 459 U.S. 359, 368, 103

28

1  S. Ct. 673, 679 (1983)(federal courts are bound to accept the state

2  court's construction of that state's statutes).

3

4      Here, Petitioner challenges the sufficiency of the evidence tying

5  him to the robbery of Liu, Ng, Fung, and Smith. He points out that none

6  of the four women ever identified him as one of the robbers, and his

7  fingerprints were not found on Liu's car or its contents. (Petition at

8  5.)

9

10     On direct appeal, the California Court of Appeal rejected

11  Petitioner's arguments, stating that the convictions were "well

12  supported by circumstantial evidence." (Lodgment No. 3 at 9.) This

13  Court has reviewed the evidence tying Petitioner to the robbery of Liu,

14  Ng, Fung, and Smith and concurs in the state appellate court's

15  conclusion.

16

17     Petitioner and Pham were identified by Tran as the men who

18  carjacked her car and kidnapped and robbed her. (2 RT 196.) The second

19  robbery took place two hours after the robbery of Tran and five miles

20  from the Von's store where Petitioner and Pham had driven Tran. (1 RT

21  128-29, 148.) Tran and the victims of the second robbery gave similar

22  descriptions of the perpetrators. Tran stated that the men who

23  kidnapped and robbed her were Vietnamese and about 19 to 20 years old,

24  and that the man she identified as Petitioner wore a brown jacket and

25  carried a gun. (1 RT 127-28; 2 RT 167-70.) The victims of the second

26  robbery described the perpetrators to the police as Vietnamese. (3 RT

27  470, 477.) Liu described the men as between 18 and 22 years old, and

28

16

1   she stated that the man who confronted her wore a brown jacket and

2   carried a black gun.   (3 RT 470.)

3

4       Furthermore, Nguyen and his car provided a common link between the

5   two robberies. The license plate of Nguyen's white Toyota matched the

6   license plate of the white Toyota that followed Tran's Honda to the

7   Von's parking lot, and his fingerprints were found on Tran's car.   (1

8   RT 101; 2 RT 371; 3 RT 571-72.)   Liu described the robbers' car as a

9   white Japanese car, and Ng's purse was found inside Nguyen's car.

10  Furthermore, Nguyen's car contained sunglasses with Petitioner's

11  fingerprints and a packet of the same brand of cigarettes that Pham had

12  instructed Tran to buy.   The same brand of cigarettes was also found in

13  Petitioner's car.[6]   (2 RT 383; 3 RT 419-20.)

14

15      This evidence, although circumstantial, was sufficient to permit

16  a rational jury to infer that Petitioner was one of the men involved in

17  the second robbery.   Circumstantial evidence is sufficient to support

18  a conviction.   See Jones v. Wood, 207 F.3d 557, 563 (9th Cir. 2000)

19  ("[A]lthough the evidence was almost entirely circumstantial and

20  relatively weak, it was sufficient to support the conviction.").

21  Petitioner's arguments regarding the differences between the two

22  robberies (i.e., number of participants, the fact that the victims of

23

24      [6]   Petitioner protests that Marlboro is a common brand of

25  cigarettes and argues that there is no significance to the fact that
    Nguyen, as well as Petitioner and/or Pham, may have smoked Marlboro

26  Lights.   (Pet. Memo. at 8.)   The presence of the brand of cigarettes
    smoked by Petitioner and/or Pham in Nguyen's car was some evidence that

27  Petitioner and Pham were in Nguyen's car the evening of the robberies.
    It may not have been strong evidence, but it was not the only evidence.

28  In any case, on habeas review, this Court may not re-weigh the evidence.

1   the second robbery were not driven anywhere) go to the strength of the

2   evidence rather than its sufficiency.  On habeas review, the Court must

3   resolve all conflicting inferences in favor of the prosecution.

4   <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. at 2789; <u>Walters</u>, 45 F.3d at 1358.

5

6       The Court concludes that the state courts' denial of this claim was

7   not contrary to, or an unreasonable application of, clearly established

8   federal law as set forth by the United States Supreme Court, including

9   <u>Jackson</u>.  Ground One, therefore, does not warrant federal habeas relief.

10

11  II.  <u>PETITIONER'S INSTRUCTIONAL ERROR CLAIM DOES NOT WARRANT FEDERAL</u>

12       <u>HABEAS RELIEF</u>.

13

14      By Ground Two, Petitioner contends that his right to due process

15  was violated when the trial court rejected his proposed modification to

16  CALJIC No. 2.92, the standard jury instruction setting forth the factors

17  to be considered in proving identity by eyewitness testimony.[7]

18

19      [7]   CALJIC No. 2.92 [Factors to Consider In Proving Identity by
    Eyewitness Testimony], as given by the trial court, states:

20          Eyewitness testimony has been received in this trial for
21      the purpose of identifying the defendant as the perpetrator of
        the crimes charged.  Many factors can affect the accuracy of
22      such identification.  In determining the weight to be given
        eyewitness identification testimony, you should consider the
23      believability of the eyewitness as well as other factors which
        bear upon the accuracy of the witness's identification of the
24      defendant, including, but not limited to any of the following
        factors:

25          The opportunity of the witness to observe the alleged
26      criminal act and perpetrator of the act;
            The stress, if any, to which the witness was subjected at
27      the time of the observation;
            The witness's ability, following the observation, to
28      provide a description of the perpetrator of the act;

                                    18

1   Petitioner's proposed modification would have instructed the jury to

2   "view eyewitness testimony with caution and evaluate it carefully."

3   (Pet. Memo. at 9; *see* CT 259.)   Petitioner contends that the trial

4   court's refusal of the proffered modification violated his due process

5   right to have the jury instructed regarding his defense theory of

6   mistaken identification.   (Pet. Memo. at 12.)

7

8      On direct appeal, the California Court of Appeal ruled that the

9   trial court did not err in refusing the proposed modification to CALJIC

10  No. 2.92, because the instruction, as given, "adequately provided the

11

12

13  _____

        The extent to which the defendant either fits or does not
14  fit the description of the perpetrator of the act;
        The cross-racial or ethnic nature of the identification;
15      The witness's capacity to make an identification;
        The effect, if any, of "weapon's focus" on the
16  identification;
        Evidence relating to the witness' ability to identify
17  other alleged perpetrators of the criminal act;
        Whether the witness was able to identify or failed to
18  identify the alleged perpetrator in a photographic or physical
    lineup;
19      The period of time between the alleged criminal act and
    the witness's identification;
20      Whether the witness had prior contacts with the alleged
    perpetrator;
21      The extent to which the witness is either certain or
    uncertain of the identification;
22      Whether the witness's identification is in fact the
    product of her own recollection;
23      Testimony of any expert regarding acquisition, retention
24  or retrieval of information presented to the senses of a
    witness.
25
        In weighing the identification testimony of an
26  eyewitness, you should, therefore, evaluate all the relevant
    evidence, both positive and negative, that may bear on the
27  witness's ability to make an identification.

28  (CT 293.)

1   jury with the factors it should consider in evaluating eyewitness

2   identification."   (Lodgment No. 3 at 17.)

3

4      A claim of instructional error does not raise a cognizable federal

5   claim, unless the error "so infected the entire trial that the resulting

6   conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 71-

7   72, 112 S. Ct. 475, 481-82 (1991); Henderson v. Kibbe, 431 U.S. 145,

8   154, 97 S. Ct. 1730, 1736-37 (1977); Cupp v. Naughten, 414 U.S. 141,

9   146-47, 94 S. Ct. 396, 400 (1973).   In determining whether a

10  constitutional violation has occurred, the claimed instructional error

11  must be viewed in light of the instructions as a whole, as well as the

12  trial record.  See Estelle, 502 U.S. at 72, 112 S. Ct. at 482; Cupp, 414

13  U.S. at 146-47, 94 S. Ct. at 400.   Because an omitted instruction is

14  less likely to be prejudicial than a misstatement of the law, a

15  petitioner relying on the failure to give a particular instruction bears

16  an especially heavy burden. Henderson, 431 U.S. at 155, 97 S. Ct. at

17  1737.

18

19     A criminal defendant is entitled to have the trial court instruct

20  the jury on his theory of defense, provided that it is supported by law

21  and has some foundation in the evidence. Conde v. Henry, 198 F.3d 734,

22  739 (9th Cir. 2000).  However, the jury here was adequately instructed

23  regarding Petitioner's mistaken identification defense. As given by the

24  trial court, CALJIC No. 2.92 set forth the factors the jury should

25  consider in evaluating the accuracy of an identification and the

26  reliability of eyewitness testimony. In People v. Wright, 45 Cal. 3d

27  1126, 248 Cal. Rptr. 600 (1988), the California Supreme Court expressly

28  held that when the jury is instructed with CALJIC No. 2.92, an

1    additional instruction advising the jury that eyewitness identification
2    testimony should be viewed with caution is "both improper and
3    unnecessary." *Id.* at 1153, 248 Cal. Rptr. at 616. The state high court
4    held that the cautionary instruction was unnecessary, because the CALJIC
5    No. 2.91 "properly highlights the factors" relevant to the reliability
6    of eyewitness identification testimony. *Id.* The California Supreme
7    Court reasoned that the provision of additional cautionary language
8    would "unbalance the jury's deliberative process" by placing unwarranted
9    emphasis on the eyewitness identification and giving the jury the
10   impression that the court regarded eyewitness identification evidence
11   as "not only particularly important but also overwhelmingly suspect."
12   *Id.* at 1153, 248 Cal. Rptr. at 616-17.

13

14       Thus, although Petitioner's challenge to Tran's identification of
15   him as one of the robbers was the linchpin of his defense, CALJIC No.
16   2.92 as given was sufficient to instruct the jury regarding the factors
17   it should consider in assessing the reliability of Tran's
18   identification.    The jury was adequately instructed regarding
19   Petitioner's theory of defense, and the trial court's refusal to give
20   the proffered modification did not constitute error under state law,
21   much less error rising to the level of a due process violation depriving
22   Petitioner of his right to a fair trial. *See* Estelle, 502 U.S. at 72,
23   112 S. Ct. at 482; Henderson, 431 U.S. at 154, 97 S. Ct. at 1736.

24

25       Accordingly, the state courts' denial of this claim was not
26   contrary to, or an unreasonable application of, clearly established
27   federal law as set forth by the United States Supreme Court.   Ground
28   Two, therefore, does not warrant federal habeas relief.

21

III. **PETITIONER'S JURY MISCONDUCT CLAIM DOES NOT WARRANT FEDERAL HABEAS**

   **RELIEF**.

   By Ground Three, Petitioner contends that juror misconduct deprived him of his Sixth Amendment right to an impartial jury.  (Petition at 6-9; Pet. Memo. at 13-20.)

   During trial, Juror No. 2 informed the trial court that, in the preceding week, she had received a telephone call at her home from an unknown woman who asked to speak with a "Pham" or a name similar to "Pham."  (4 RT 633-35, 642, 645-46.)  "Pham" was the name of Petitioner's co-defendant.  Juror No. 2 stated that she had commented about this "weird" coincidence to one or more jurors and that other jurors may have overheard her.  (4 RT 635-36.)  Juror No. 2 advised the court that, since receiving the call, she had become increasingly anxious and had trouble sleeping.  (4 RT 635, 637, 638-39.)

   The parties stipulated that Juror No. 2 would be excused, and the trial court individually questioned each of the other jurors and alternates regarding their contacts with Juror No. 2.  (4 RT 639-640, 647-69, 678-79.)  Juror Nos. 1 and 3 through 11 and the two alternates stated that they either did not talk with Juror No. 2 or only discussed innocuous matters such as children, schools, and movies.  The jurors stated that Juror No. 2 never talked about any phone calls, and they assured the court that her dismissal would not affect their ability to be impartial. (4 RT 647-69.)

1    Juror No. 12 was the only juror who remembered Juror No. 2
2    mentioning a telephone call. She recalled Juror No. 2 describing the
3    telephone call as "strange," but did not remember much about it, as she
4    had not been paying attention to Juror No. 2's comments regarding the
5    call. Juror No. 12 further stated that Juror No. 2 had mentioned the
6    name of the caller, but Juror No. 12 could not remember it; she thought
7    it might have started with an "H." (4 RT 664-65.) Juror No. 12
8    remembered that she was surprised when Juror No. 2 then asked her for
9    her last name. (4 RT 664-65.) When the trial court asked whether Juror
10   No. 2 indicated that the phone call had something to do with the trial,
11   Juror No. 12 indicated she did not think so, but said she assumed it
12   did. She repeated that she thought it strange that Juror No. 2 asked
13   her for her last name. (4 RT 664-65.) Juror No. 12 said that she would
14   decide the case based on the evidence, and her impartiality would not
15   be affected if Juror No. 2 was dismissed from the trial. (4 RT 665.)
16
17   Petitioner's counsel moved for a mistrial, arguing that even though
18   all but one of the jurors professed to have no memory of speaking with
19   Juror No. 2 regarding the telephone call, the jurors might later
20   remember something that would affect their impartiality. (4 RT 670-71.)
21   The trial court denied the motion for a mistrial, but offered to dismiss
22   Juror No. 12 in an "abundance of caution." (4 RT 672, 677.)
23   Petitioner's counsel stated that, if there was to be no mistrial, she
24   would prefer to have Juror No. 12 on the jury rather than either of the
25   alternates. (4 RT 673-74.)
26
27   On direct appeal, the California Court of Appeal held that the
28   trial court had properly denied the motion for a mistrial. Pointing out

1   that, under California law, the presumption of prejudice caused by juror

2   misconduct may be rebutted by proof that no prejudice resulted, *see* In

3   re Hitchings, 6 Cal. 4th 97, 118, 24 Cal. Rptr. 2d 74, 85 (1993) the

4   state appellate court concludes that the trial court's inquiry was

5   sufficient to determine that Juror No. 2's comments had not affected

6   Juror No. 12's impartiality.  (Lodgment No. 3 at 19.)

7

8       The  constitutional  standard  of  fairness  guarantees  criminal

9   defendants a panel of impartial, indifferent jurors. Murphy v. Florida,

10  421 U.S. 794, 799, 95 S. Ct. 2031, 2036 (1975); Irvin v. Dowd, 366 U.S.

11  717, 722, 81 S. Ct. 1639, 1642 (1961); Dyer v. Calderon, 151 F.3d 970,

12  973 (9th Cir. 1998)(*en banc*).  Petitioner characterizes the misconduct

13  at issue as a case of jury tampering.  According to him, Juror No. 12

14  was affected by the communication directed at Juror No. 2 when Juror No.

15  2 told Juror No. 12 about it.  (Pet. Memo. at 17.)  He argues that the

16  inquiry conducted by the trial court was inadequate to dispel the taint

17  of prejudice under the guidelines set forth by the United States Supreme

18  Court in United States v. Remmer, 347 U.S. 227, 229, 74 S.Ct. 450, 451

19  (1954).

20

21      In Remmer, the Supreme Court addressed the issue of unauthorized

22  contact with jurors, stating that a private communication or tampering

23  with a juror during trial about the matter pending before the jury is

24  presumptively  prejudicial.   The  presumption  of  prejudice  is  not

25  conclusive, but it is the government's burden to establish that the

26  contact was harmless.  *Id.* at 229-30, 74 S. Ct. at 451-52.  The remedy

27  for allegations of jury bias or tampering is a hearing, at which the

28  trial court can determine "the circumstances of what transpired, the

24

1   impact on the jurors, and whether or not it was prejudicial." <u>United</u>

2   <u>States v. Angulo</u>, 4 F.3d 843, 847 (9th Cir. 1993)(*citing* <u>Remmer</u>, 347

3   U.S. at 229-30, 74 S. Ct. at 451-52); *see also* <u>Smith v. Phillips</u>, 455

4   U.S. 209, 216, 102 S. Ct. 940, 945 (1982).

6        In <u>Angulo</u>, the Ninth Circuit reversed a conviction when one juror

7   received a threatening phone call and told other jurors about it.

8   Although the district court removed from the jury the juror who had

9   received the call, it did not remove the other jurors who had been told

10  of the call.  Critically, the district court did not hold a hearing to

11  determine the effect of the threat upon the other jurors and did not

12  explain to them the threatened juror's absence. <u>Angulo</u>, 4 F.3d at 847.

13  The Ninth Circuit stated that when a threat directed at one juror is

14  communicated to other jurors, "the trial judge must fully examine the

15  effect of the threat on the remaining jurors." *Id.*

17       Here, unlike in <u>Angulo</u>, the trial court questioned all jurors in

18  order to determine whether they had heard about the call received by

19  Juror No. 2 and were affected by it.  (*See* 4 RT 647-69.)  In order to

20  minimize speculation about her absence, the trial court explained to

21  them that it had agreed to dismiss Juror No. 2 "for personal reasons."

22  All but one of the jurors disclaimed any knowledge of the telephone call

23  received by Juror No. 2; the remaining juror, Juror No. 12, remembered

24  Juror No. 2 talking about a telephone call she had received that she

25  considered "strange," but did not really pay attention to Juror No. 2's

26  comments regarding the call.  She thought it strange that Juror No. 2

27  asked for her name, but appeared unaware of any connection between the

28  call and the defendants.  (*See* 4 RT 664-65.)

1    Petitioner argues that the trial court's inquiry was inadequate,

2  because the trial court did not ask Juror No. 12 about how she "felt

3  about the call or being questioned by the court or about Juror No. 2

4  being let go," and did not follow up on her statement that she assumed

5  the call had something to do with the case.    (Pet. Memo. at 19.)

6  However, Juror No. 12 obviously did not ascribe much importance to Juror

7  No. 2's communications about the call, because she could not remember

8  any details about it despite her assumption that it had something to do

9  with the trial.  (4 RT 664-65.)   It was unnecessary for the trial court

10  to ask her how she "felt" about the call in light of her statement that

11  she did not pay much attention to what Juror No. 2 was telling her about

12  it.   As for Petitioner's contention that the trial court did not ask

13  Juror No. 12 how she felt about being questioned by the court, the

14  purpose of the court's inquiry is to explore the effects of the threat,

15  not the effects of the inquiry.  *See* Angulo, 4 F.3d at 847.  Moreover,

16  Juror No. 12 assured the trial court that she would decide the case

17  based solely in the evidence.   (4 RT 665.)

18

19    The trial court's inquiry, therefore, was sufficient to determine

20  that Juror No. 2's communications to Juror No. 12 about the telephone

21  call  would  not  adversely  affect  Juror  No.  12's  deliberations.

22  Furthermore, it was Petitioner who decided, through his counsel, that

23  Juror No. 12 should stay on the panel despite her exposure to Juror No.

24  2's comments about the call.   The trial court offered to dismiss Juror

25  No. 12 and replace her with an alternate; Petitioner's counsel declined

26  the offer because she preferred Juror No. 12 to the alternates.   (4 RT

27  673-74.)   Having expressly elected to have Juror No. 12 remain on the

28

1    jury, Petitioner cannot now complain that her presence impaired his

2    constitutional rights.

3

4         For these reasons, the state courts' denial of this claim was not

5    contrary to, or an unreasonable application of, clearly established

6    federal law as set forth by the United States Supreme Court.   Ground

7    Three, therefore, does not warrant federal habeas relief.

8

9    IV.  **PETITIONER'S SENTENCING CLAIM DOES NOT WARRANT FEDERAL HABEAS**

10        **RELIEF.**

11

12        By Ground Four, Petitioner contends that his sentence violates due

13   process, because the trial court erroneously believed that: the

14   sentencing option advocated by Petitioner, namely, sentencing Petitioner

15   on the lesser carjacking count and staying the sentence on the greater

16   kidnapping for carjacking count, was prohibited by law; and California

17   law required the trial court to dismiss the lesser carjacking count and

18   sentence Petitioner on the greater kidnapping for carjacking count.

19   (Petition at 9; Pet. Memo. at 20-23.)

20

21        Absent an independent constitutional violation, "it is not the

22   province  of  a  federal  habeas  court  to  reexamine  state-court

23   determinations on state-law questions."  Estelle, 502 U.S. at 68, 112

24   S. Ct. at 480;  Bonin v. Calderon, 59 F.3d 815, 841 (9th Cir.

25   1995)(violation of a "state law right does not warrant habeas corpus

26   relief").   Generally, a challenge to a state court's application of

27   state sentencing laws does not create a federal question cognizable on

28   federal habeas review.  See Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.

1   Ct. 3092, 3102 (1990); <u>Campbell v. Blodgett</u>, 997 F.2d 512, 522-24 (9th

2   Cir. 1992). "Absent a showing of fundamental unfairness, a state

3   court's misapplication of its own sentencing laws does not justify

4   federal habeas relief." <u>Christian v. Rhode</u>, 41 F.3d 461, 469 (9th Cir.

5   1994).

6

7       Here, Petitioner's claim that the trial court erred in sentencing

8   him on the greater kidnapping for carjacking count, rather than on the

9   lesser carjacking count, is cognizable only as a state law claim; it is

10   not cognizable on federal habeas review. <i>See</i> <u>Cacoperdo v. Demosthenes</u>,

11   37 F.3d 504, 506 (9th Cir. 1994)(petitioner's claim that the state court

12   erred in imposing consecutive sentences was not cognizable in federal

13   habeas); <u>Hendricks v. Zenon</u>, 993 F.2d 664, 674 (9th Cir. 1993)

14   (defendant's claim that state court was required to merge his

15   convictions was not cognizable); <u>Watts v. Bonneville</u>, 879 F.2d 685, 687

16   (9th Cir. 1989)(petitioner's claim that the trial court violated

17   California Penal Code § 654 in sentencing him was not cognizable).

18

19       Furthermore, even if Petitioner's claim could be construed as a

20   cognizable federal claim, it fails because the trial court correctly

21   applied California law. A California defendant may be convicted of

22   multiple crimes arising from a single act or indivisible transaction,

23   but the defendant may be punished only for one of the crimes.

24   California Penal Code § 654; <u>People v. Djekich</u>, 229 Cal. App. 3d 1213,

25   1220, 280 Cal. Rptr. 824, 828 (1991). However, a California defendant

26   may not be convicted of multiple crimes when one crime is a necessarily

27   included offense of the other, <i>i.e.</i>, when the greater crime cannot be

28   committed without committing the lesser crime. <u>People v. Pearson</u>, 42

28

1   Cal. 3d 351, 355, 228 Cal. Rptr. 509, 510 (1986).  In such a case, the

2   trial court must dismiss the lesser count.  *Id.*

3

4       At sentencing, Petitioner argued, as he does here, that, under the

5   version of California Penal Code § 654 in effect at the time and as

6   interpreted in People v. Norrell, 13 Cal. 4th 1, 51 Cal. Rptr. 2d 429

7   (1996), the trial court was not required to dismiss the lesser

8   carjacking count and could sentence him on either the lesser or the

9   greater count.[8]  In Norrell, the California Supreme Court held that the

10  then-current version of Section 654 authorized the court to impose a

11  sentence for a lesser offense of robbery and stay the sentence on the

12  greater offense of kidnapping for the purpose of robbery.  *Id.* at 5-6,

13  51 Cal. Rptr. 2d at 431-32.  However, as the California Court of Appeal

14  pointed out, although under the specific facts of Norrell the robbery

15  count was a lesser included offense of the kidnapping for purpose of

16  robbery count, robbery is not a *necessarily* included offense, because

17  kidnapping for purpose of robbery can be completed without a  robbery.

18  (Lodgment No. 3 at 22.)  Carjacking, on the other hand, is a necessarily

19  included offense of kidnapping during the commission of carjacking.

20  (*Id.*)  *See* People v. Jones, 75 Cal. App. 4th 616, 624-625, 89 Cal. Rptr.

21  2d 485, 491 (1999)(carjacking is a necessarily included offense of

22  kidnapping for carjacking).  Thus, Norrell did not apply, and the trial

23  court was required to dismiss the lesser necessarily included carjacking

24

25      [8]    Under Section 654 as it existed at the time of the Norrell

26  case and Petitioner's conviction, a court could elect to sentence a
    defendant under either the lesser or the greater count.  Section 654 was

27  later modified to provide that the court must stay the lesser count and
    sentence the defendant under the greater count.  *See* People v. Kramer,

28  29 Cal. 4th 720, 722, 128 Cal. Rptr. 2d 407, 407-08 (2002).

                              29

count under Section 654 and to sentence Petitioner on the greater

kidnapping for carjacking count. Thus, Petitioner has not shown a

misapplication of state law, much less one rising to the level of a due

process violation. <u>Christian</u>, 41 F.3d at 469.


The state courts' denial of this claim was not contrary to, or an

unreasonable application of, any clearly established federal law as set

forth by the United States Supreme Court. Accordingly, Ground Four does

not warrant federal habeas relief.


## V.   PETITIONER'S EIGHTH AMENDMENT CLAIM DOES NOT WARRANT FEDERAL HABEAS RELIEF.


By Ground Five, Petitioner contends that his sentence of life in

prison with the possibility of parole, plus 14 years, amounts to cruel

and unusual punishment in violation of the Eighth Amendment. (Petition

at 10; Pet. Memo. at 23-27.) Petitioner argues that the length of his

sentence is disproportionate to his crimes because of his youth, lack

of criminal sophistication, lack of criminal history, and the absence

of any physical injury to the victims. (Petition at 10; Pet. Memo. at

23, 27.)


In its 2003 opinion in <u>Andrade</u>, *supra*, the Supreme Court held that

although its precedents regarding Eighth Amendment claims challenging

the length of a sentence "have not been a model of clarity," for

purposes of the AEDPA's "clearly established Federal law" requirement,

"one governing legal principle emerges," namely, that "[a] gross

disproportionality principle is applicable to sentences for terms of

years." Andrade, 538 U.S. at 72, 123 S. Ct. at 1173 (citations

omitted). The Supreme Court cautioned, however, that "the precise

contours of [this principle] are unclear, applicable only in the

'exceedingly rare' and 'extreme' case." Id. at 72-73, 123 S. Ct. at

1173.


The prior Supreme Court precedents setting forth the law in this

area are Rummel v. Estelle, 445 U.S. 263, 100 S. Ct. 1133 (1980), Solem

v. Helm, 463 U.S. 277, 296, 103 S. Ct. 3001, 3013 (1983), and Harmelin

v. Michigan, 501 U.S. 957, 111 S. Ct. 2680 (1991). In Rummel, the

Supreme Court rejected an Eighth Amendment challenge to a mandatory life

sentence imposed for a felony conviction of theft of obtaining $120.75

by false pretenses. Rummel's two predicate felonies consisted of the

fraudulent use of a credit card and passing a forged check. 445 U.S.

at 265-66, 100 S. Ct. at 1134-35. The high court stressed that,

"[o]utside the context of capital punishment, successful challenges to

the proportionality of particular sentences [are] exceedingly rare."

Id. at 272, 100 S. Ct. at 1138.


In Solem, the Supreme Court held that a recidivist sentence of life

without the possibility of parole for the crime of uttering a "no

account check" for $100.00 was "significantly disproportionate" to the

crime and violated the Eighth Amendment. 463 U.S. at 303, 103 S. Ct.

at 3016-17. The Supreme Court articulated three criteria for evaluating

a claim of disproportionality under the Eighth Amendment: "(i) the

gravity of the offense and the harshness of the penalty; (ii) the

sentences imposed on other criminals in the same jurisdiction; and (iii)

1   the sentences imposed for commission of the same crime in other

2   jurisdictions." *Id.* at 292, 103 S. Ct. at 3011.

3

4       In *Harmelin*, the Supreme Court rejected an Eighth Amendment

5   challenge to a mandatory sentence of life without the possibility of

6   parole for a first-time felon convicted of possessing more than 650

7   grams of cocaine.   In a plurality opinion, Justice Kennedy concluded

8   that, in non-capital cases, the Eighth Amendment does not require strict

9   proportionality between a sentence and the crime on which it is based,

10  but "forbids only extreme sentences that are 'grossly disproportionate'

11  to the crime."   501 U.S. at 1001, 111 S. Ct. at 2705 (J. Kennedy,

12  concurring).   Under *Harmelin*, if a threshold comparison of petitioner's

13  sentence to his crime does not raise an inference of gross

14  disproportionality, the second and third factors identified in *Solem*

15  need not be considered.   *Id.* at 1005, 111 S. Ct. at 2707; *see also*

16  *United States v. Harris*, 154 F.3d 1082, 1084 (9th Cir. 1998).

17

18      In reviewing the appropriateness of a particular sentence, courts

19  must "grant substantial deference to the broad authority that

20  legislatures necessarily possess in determining the types and limits of

21  punishments."   *Solem*, 463 U.S. at 289-90, 103 S. Ct. at 3004.   The gross

22  disproportionality principle "gives legislatures broad discretion to

23  fashion a sentence that fits within the scope of the proportionality

24  principle."   *Andrade*, 538 U.S. at 76, 123 S. Ct. at 1175.

25

26      In this case, a comparison of Petitioner's crime with his sentence

27  does not give rise to an inference of gross disproportionality.   As the

28  California Court of Appeal stated in denying Petitioner's Eighth

32

Amendment claim: "[Petitioner] and Pham armed themselves, deliberately targeted a woman as she got into her car and drove the terrified victim a distance of several miles while threatening her and taking her belongings." (Lodgement No. 3 at 24.)  Within hours, Petitioner and Pham, together with two companions, had robbed four other women in their car.  For these crimes, Petitioner received 14 years plus life *with* the possibility of parole.  In <u>Harmelin</u>, the defendant received a sentence of life *without* the possibility of parole for a first-time offense of possession of a substantial amount of cocaine, and the Supreme Court did not view the sentence as disproportionate.  In light of the Supreme Court precedents in this area, which limit the inference of gross disproportionality to the "'exceedingly rare' and 'extreme' case," Petitioner's sentence cannot reasonably be deemed grossly disproportionate to the crime.[9]  <u>Andrade</u>, 538 U.S. at 72-73, 123 S. Ct. at 1173; <u>Rummel</u>, 445 U.S. at 272, 100 S. Ct. at 1138.  Its length is well within the broad discretion allowed to state legislatures in fashioning appropriate punishments under the Constitution.  <u>Andrade</u>, 538 U.S. at 76, 123 S. Ct. at 1175.

Accordingly, the state courts' denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the United States Supreme Court.  Ground Five, therefore, does not warrant federal habeas relief.

///

///

---

[9]    As a result of this conclusion, the Court need not address the second and third <u>Solem</u> factors.  *See* <u>Harmelin</u>, 501 U.S. at 1005, 111 S. Ct. at 2707.

## RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order:   (1)  approving  and  adopting  the  Report  and Recommendation;  (2)  denying  the  Petition;  and  (3)  directing  that judgment be entered dismissing this action with prejudice.

DATED: May 19, 2005

_Margaret A. Nagle_
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Reports  and  Recommendations  are  not  appealable  to  the  Court  of Appeals, but may be subject to the right of any party to file objections as provided in the Local Rules Governing the Duties of Magistrates and review by the District Judge whose initials appear in the docket number. No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until entry of the judgment of the District Court.

34